2015 UT App 206

## THE UTAH COURT OF APPEALS

WILLIAM T. JACOB AND JANEANE W. JACOB,
Plaintiffs and Appellants,

*v.*

HELEN T. BATE, ROBERT T. BATE, AND BRAD TAYSOM,
Defendants and Appellees.

Opinion
No. 20130868-CA
Filed August 13, 2015

Fourth District Court, Provo Department
The Honorable Steven L. Hansen
No. 100404120

Randall K. Spencer and Kara H. North, Attorneys
for Appellants

Robert L. Jeffs, Attorney for Appellees

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES GREGORY K. ORME and KATE A. TOOMEY concurred.

CHRISTIANSEN, Judge:

¶1     Appellants William T. Jacob and JaNeane W. Jacob appeal
from the trial court's decision that Appellees Helen T. Bate,
Robert T. Bate, and Brad Taysom obtained a limited prescriptive
easement in the Jacobs' open alleyway. We affirm.

### BACKGROUND

¶2     Appellants filed this action seeking to quiet title to real
property located on Main Street in American Fork, Utah.[1]

---

1. On appeal from a bench trial, we recite the facts in the light
most favorable to the trial court's factual findings. *Bel Courtyard
Invs., Inc. v. Wolfe*, 2013 UT App 217, ¶ 2 n.1, 310 P.3d 747.

Appellants own a commercial building located at 76 West Main Street and an adjacent alley (the Jacob Property). The Bates own the property immediately to the west of the Jacob Property, consisting of two apartment buildings connected by a carport and an "L" shaped commercial building (the Bate Property). Taysom is the Bates' tenant on the Bate Property.[2] The dispute in this case centers on Appellees' right to use an alley on the Jacob Property—a "10 foot by 130 foot alley" that runs north to south along the west edge of the Jacob Property and abutting the Bate Property (the Alleyway). A three-foot wide alley on the Bate Property connects to the Alleyway between the Bates' apartment buildings and their commercial building. The apartment buildings' carport also includes a doorway providing access to the Alleyway.



2. Our review of the record indicates that Taysom agreed to purchase the Bate Property from the Bates in 2006. But it does

(continued…)

¶3    In 1913, an investment company owned both the Bate Property and the Alleyway. Due to unpaid property taxes, Utah County took title to the Alleyway in January 1935. Reva Beck Bosone,[3] the Jacobs' predecessor-in-interest, acquired the Jacob Property, including the Alleyway, between 1939 and 1940.

¶4    In 1936, William Preston and Elmer Bate, Robert Bate's grandfather, purchased the Bate Property. The real estate contract for the sale purported to grant a perpetual right-of-way over the Alleyway. At the time of the sale, however, the owner of the Bate Property no longer owned the Alleyway as a result of the tax sale. The seller of the Bate Property therefore lacked the legal authority to transfer any interest in the Alleyway. In 1951, Elmer Bate conveyed the Bate Property to Robert Bate's father. The deed also purported to convey the right-of-way over the Alleyway.

¶5    In approximately 1945, the Bate family began to operate a hardware store out of the commercial building located on the Bate Property. Robert Bate's father used the Alleyway for loading and unloading, picking up and dropping off goods transported to and from another store in Salt Lake City, and parking cars occasionally. Robert Bate's father would also use

---

(…continued)
not appear that a deed conveying the Bate Property to Taysom has ever been recorded, as the Bates remain the record title holders. We therefore consider Taysom the Bates' tenant for purposes of this decision. This distinction does not, however, substantively affect our analysis.

3. Reva Beck Bosone has considerable significance beyond her minor role in one of the relevant title chains in this case. Well known in Utah legal circles, Bosone was Utah's first female judge and first female congressional delegate. *Reva Beck Bosone: A "First" for Utah*, United States Capitol Historical Society (Mar. 8, 2012), http://uschs.wordpress.com/2012/03/08/reva-beck-bosone-a-first-for-utah/.

the Alleyway to access or perform maintenance on the apartment buildings on the Bate Property. The Bate family continuously used the Alleyway for these purposes until sometime in 1977, when Robert Bate's brother purchased the Jacob Property, took over operation of the family's hardware store, and moved it next door to the commercial building located on the Jacob Property.

¶6    In the 1950s, a grocery store operated out of the Jacob Property. The grocery store took deliveries through the Alleyway. During the time that both the hardware store and the grocery store operated, the two businesses accommodated each other's use of the Alleyway.

¶7    The Jacob Property was deeded several times without any reference to a right-of-way until 1987. In July 1987, Appellants acquired the Jacob Property, including the Alleyway, by warranty deed. The conveyance to Appellants provided that the Jacob Property was "SUBJECT to a Right of Way" over the Alleyway in favor of the Bate Property. At that time, there was an unlocked chain placed across the Alleyway between two concrete posts. While it is unclear who originally placed the chain across the Alleyway, how long the chain had been there, or the purpose of the chain, William Jacob placed a lock on the chain in July 1987 after Appellants purchased the Jacob Property.

¶8    In 2001, Taysom began to rent part of the commercial building located on the Bate Property for his automotive business. During his time as a tenant, Taysom would perform maintenance on the Bate Property. When he needed to access the Alleyway for maintenance, Taysom would "go over" the chain or "walk through" if the chain was not in place. In November 2006, Taysom agreed to purchase the Bate Property.

¶9    In November 2006, Appellees' attorney sent a letter to Appellants objecting to the lock on the chain as it interfered with Appellees' use of the Alleyway. William Jacob responded to the letter and acknowledged that Appellees had a "reasonable right to pass over a portion of [the] land" and that "[d]uring the past twenty years the chain has been positioned in such a manner

that can be stepped over and your client has enjoyed additional access through an adjoining door to pass over a portion of [the] land." William Jacob also stated that "from time-to-time, and based upon reasonable request, I have opened the chain to provide reasonable access to [Appellees], various workmen, utility companies, and others." William Jacob concluded his letter, stating that he hoped "[Appellees] will continue to use the right to pass over my land in accordance with the same reasonable and usual enjoyment standard, as established during the past 20 years."

¶10    During the summer of 2007, Taysom requested a key to the lock on the chain across the Alleyway. When he did not receive a key to remove the lock, Taysom began breaking the chain to access the Alleyway. Taysom also admitted to cutting the concrete posts and the loop connecting the chain to the posts. The Jacobs called the police on about twenty separate occasions in response to Taysom's cutting of the chain and posts.

¶11    Several years later, Appellants filed this action seeking to quiet title to the Alleyway after William Jacob discovered the defect in the 1935 deed's ultra vires grant of a right-of-way. In the alternative, Appellants sought "to establish title through adverse possession" and requested "damages for civil trespass and injunctive relief." Appellants filed a motion for summary judgment on their claims. The trial court granted Appellants' motion with respect to the quiet-title claim, stating that there was no express easement or right-of-way over the Alleyway, but denied Appellants' motion as to the claims of trespass and adverse possession.

¶12    After a bench trial, the court issued a written decision concluding that a prescriptive easement in favor of the Bate Property had developed for "ingress and egress of the [Alleyway] for proper maintenance of the adjacent buildings." The court also concluded that Appellants "were one year short of the required twenty years" to extinguish the prescriptive easement. The court declined to award damages for trespass. Appellants now appeal.

ISSUES AND STANDARDS OF REVIEW

¶13    First, Appellants argue that the trial court's conclusion that Appellees had obtained a prescriptive easement in the Alleyway was erroneous because (1) the court incorrectly applied a presumption of adverse use rather than a presumption of permissive use and (2) the finding that a prescriptive easement existed was not supported by sufficient evidence. "[W]hether the trial court applied the proper legal standard is a question of law that is reviewed for correctness." *Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177. While the conclusion that a prescriptive easement exists is a question of law, *see Valcarce v. Fitzgerald*, 961 P.2d 305, 311 (Utah 1998), "it is so fact-dependent that trial courts are generally accorded 'a broad measure of discretion when applying the correct legal standard to the given set of facts' and are only overturned if the trial court's decision was in excess of this broad discretion," *Lunt v. Lance*, 2008 UT App 192, ¶ 9, 186 P.3d 978 (quoting *Valcarce*, 961 P.2d at 311). "An appellate court will reverse a trial court's decision that clear and convincing evidence was presented only if that decision is clearly erroneous," notwithstanding the clear and convincing standard of proof below. *Id.* ¶ 18. "To qualify as clearly erroneous a trial court's findings [must be] either against the clear weight of the evidence or [must] induce a definite and firm conviction that a mistake has been made." *Id.* (alterations in original) (citation and internal quotation marks omitted). But a finding is not clearly erroneous if, viewing the evidence in the light most favorable to the trial court's findings, the evidence is legally sufficient to support the finding. *Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

¶14    Second, Appellants claim that the trial court erred in failing to find that the prescriptive easement was extinguished. They specifically challenge the trial court's finding that the prescriptive period for extinguishment began to run in 1987, rather than 1982 as they had argued. Whether specific actions constitute adverse use sufficient to extinguish an easement is a question of fact. *See Public Storage, Inc. v. Eliot St. Ltd. P'ship*, 567 A.2d 389, 381 (Conn. App. Ct. 1989). "[W]e review the factual

findings of a trial court under the clearly erroneous standard." *Jouflas*, 927 P.2d at 174.

¶15 Last, Appellants argue that the trial court should have awarded them damages for trespass based on Taysom's cutting the concrete blocks and chains in the Alleyway. The owner of property subject to an easement may recover damages if the use of the easement is so "'unreasonable in that it will unnecessarily damage the servient estate.'" *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1249 (Utah 1990) (quoting *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 160 (Utah 1946)). Whether Taysom's actions in accessing the Alleyway were reasonable is a question of fact, and we will not overturn the trial court's factual finding unless it is clearly erroneous or against the clear weight of the evidence. *See id.*

ANALYSIS

I. The Trial Court Correctly Determined That Appellees Obtained a Prescriptive Easement.

¶16 To establish a prescriptive easement, the claimant must show, "by clear and convincing evidence," *Buckley v. Cox*, 247 P.2d 277, 279–80 (Utah 1952), that its "use of another's land was open, continuous, and adverse under a claim of right for a period of twenty years," *Valcarce v. Fitzgerald*, 961 P.2d 305, 311 (Utah 1998); *see also Orton v. Carter*, 970 P.2d 1254, 1258 (Utah 1998). Appellants contend that the trial court erred by presuming adverse use and that the evidence adduced at trial was insufficient to support the trial court's findings.

A.      Presumption of Adverse Use

¶17 Appellants first argue that the trial court erred by presuming adverse use and that the court should have instead presumed permissive use. "[O]nce a claimant has shown an open and continuous use of the land under claim of right for the twenty-year prescriptive period, the use will be presumed to have been adverse." *Valcarce*, 961 P.2d at 311; *see also Richins v. Struhs*, 412 P.2d 314, 315 (Utah 1966) (holding that "when a

claimant has shown that such a use has existed peaceably and without interference for the prescriptive period of 20 years, the law presumes that the use is adverse to the owner[] and that it had a legitimate origin" (footnotes omitted)); *Lunt v. Kitchens*, 260 P.2d 535, 537 (Utah 1953) ("The fact that the grantor with knowledge of such use, makes no protest against it is proof of his recognition of a claim of right in the grantee. In other words, it is conclusively presumed from the landowner's acquiescence for the defined period of time in the other's use[] of his land, he having the right and power to stop such user, that it is a rightful user.").

¶18     The Utah Supreme Court has stated that for a use to be adverse, "the use must be *against* the owner as distinguished from *under* the owner." *Zollinger v. Frank*, 175 P.2d 714, 715 (Utah 1946) (emphasis in original).[4] With this distinction in mind, our supreme court affirmatively established a presumption of adverse use: "where a claimant has shown an open and continuous use of the land for the prescriptive period (20 years in Utah) the use will be presumed to have been against the owner." *Id.* at 716. Thus, "to prevent the prescriptive easement from arising," "the owner of the servient estate . . . has the burden of showing that the use was *under* him instead of *against* him." *Id.*; *see also Crane v. Crane*, 683 P.2d 1062, 1065 (Utah 1984). To be adverse or "against" the servient estate, "the use must have been such that it is plainly apparent that the claimant is asserting a right so the servient owner either knows or should know that his property is being so used." *Richins*, 412 P.2d at 316. Even though it is sometimes referred to as a hostile use, it is

---

4. The *Zollinger* court also grappled with courts' sometimes inconsistent terminology used to describe this element of a prescriptive easement. *Zollinger v. Frank*, 175 P.2d 714, 715–16 (Utah 1946). The court explained that "[r]egardless of the words used to characterize this element of the nature of the use necessary to give rise to a prescriptive easement," the element is established if the use is "against the owner" of the servient estate. *Id.* at 715.

not necessary that there be any open hostility "in the use of force or any overt physical or verbal opposition." *Id.* The fact that the parties or their predecessors were sociable, "or even cordial with each other," does not prevent a prescriptive right from arising under the presumption of adverse use. *See id.*; *see also Orton*, 970 P.2d at 1259 (ruling that a party's use of a common lane was adverse even when the common lane was created through an amicable agreement and both parties jointly used the common area for decades).

¶19   Once the presumption of adverse use has been established, only then does the burden shift to the landowner opposing the easement to "establish[] that the use was initially permissive." *Valcarce*, 961 P.2d at 311–12. If the owner of the servient estate "sustains that burden and overcomes the presumption by proof that the use was initially permissive, then the burden of going forward with evidence and of ultimate persuasion shifts back to the claimant to show that the use [again] became adverse and continued for the prescriptive period." *Richins*, 412 P.2d at 316.

¶20   Appellants claim that the court erred by applying the presumption of adverse use. They argue that, under *Lunt v. Kitchens*, 260 P.2d 535 (Utah 1953), the trial court was required to apply a presumption of permissive use. They rely on *Kitchens* for the proposition that "[w]here a person opens the way for use of his own premises and another uses it without interfering with the landowner's use or causing him damage, the presumption is that the use was permissive and in absence of proof to the contrary, the person so using it does not acquire a right of way by prescription." *Id.* at 538.

¶21   However, when viewed in context, it is apparent that the presumption of permissive use applies to cases where there is evidence of a special relationship, such as a license. In *Kitchens*, a landowner brought suit to enjoin the defendants from using a driveway on her property. *Id.* at 536. The court held that beginning in 1920, the landowner's predecessors-in-interest granted a license, or at the very least, consent, to the defendants' predecessors-in-interest to use the driveway on the landowner's

property. *Id.* at 537–38. The court explained that if "the landowner consents to the use of his land, then the right created is a license and a prescriptive right cannot arise from a license unless the licensee renounces openly his claim under the license." *Id.* at 537. Because of this distinction, Utah courts have differentiated between consent or license and mere acquiescence. *See Zollinger*, 175 P.2d at 715.

¶22 Thus, the presumption of adverse use applies once the allegedly adverse user has shown an open and continuous use of the land under claim of right for the twenty-year prescriptive period, absent evidence of a license or consent of the servient landowner. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 311 (Utah 1998); *see also Kitchens*, 260 P.2d at 537–38. Here, Robert Bate testified that his family's use of the Alleyway was "ongoing from at latest 1948" through 1977. Robert Bate testified that he personally observed his father using the Alleyway continually for building maintenance through 1959. While attending college from 1959 through 1963, Robert Bate would visit his parents and continued to see his parents use the Alleyway. Though Robert Bate moved to California for a number of years after college, he testified that he visited his parents a few times a year during which time he saw no change in their usage of the Alleyway. When Robert Bate moved back to Utah, he worked part-time for his father and observed the same use of the Alleyway through approximately 1966 or 1967, at which time Robert Bate moved to Colorado. While living in Colorado, Robert Bate returned to Utah several times a year, and observed no change in his parents' operation of the store with respect to the Alleyway. Robert Bate's father and mother continued to operate the hardware store until at least 1977 when his brother purchased the Jacob Property and moved the hardware store to the Jacob Property. The court found that there was "no indication of use restriction against [Appellees'] use during a twenty year period from 1948 onward," and the "[u]se appears to have been unmolested" for at least twenty years.

¶23 To rebut the presumption of adverse use, Appellants argue that they presented evidence that Appellees' use of the

Alleyway was permissive. During cross-examination, Robert Bate testified that use of the Alleyway was "kind of a mutual thing" and each side accommodated the other's use. Appellants' attorney asked whether "the supermarket [was] fine with [the Bates] using the alley" and whether "[t]hey permitted it." While Robert Bate answered in the affirmative, the trial court found that this testimony was not evidence of permission, but of accommodation. The trial court found that no evidence was presented that any owner of the Jacob Property ever gave "permission" to the Bate Property owners or tenants to use the Alleyway sufficient to "pro[ve] that the use was initially permissive."[5] *See Richins v. Struhs*, 412 P.2d 314, 316 (Utah 1966); *see also Orton v. Carter*, 970 P.2d 1254, 1259 (Utah 1998).

¶24    Appellants failed to overcome the presumption of adverse use by presenting evidence of their predecessors granting Robert Bate's parents explicit permission to use the Alleyway.[6] Thus,

---

5. To the extent that William Jacob's letter to Appellees' attorney recognizing that Appellees had a "reasonable right to pass over a portion of [the] land" could be construed as evidence that William Jacob allowed Appellees' permissive use of the Alleyway, Appellees' prescriptive easement arose no later than 1977—before Appellants owned the Jacob Property. Thus, any evidence that William Jacob gave Appellees permission to use the Alleyway is irrelevant to the question of whether a prescriptive easement over the Alleyway arose between 1948 and 1977.

6. And the attempted grant of a right-of-way over the Alleyway in the 1936 conveyance of the Bate Property also does not constitute evidence of permissive use. Though the seller in the 1936 transaction is Appellants' predecessor-in-interest with respect to the Alleyway, at the time the purported right-of-way was granted the seller no longer owned the Alleyway. *See supra* ¶ 4. Thus, this attempt to create a perpetual right-of-way over the Alleyway is not evidence of consent or permission by the owner of the Alleyway at the time.

the trial court correctly applied the presumption of adverse use when it found that Appellees had shown that their use was open and continuous for the prescriptive period of twenty years, as discussed below.

B.      Sufficiency of the Evidence

¶25    Appellants next argue that the trial court's finding of a prescriptive easement was not supported by sufficient evidence because Appellees presented insufficient evidence to support the court's findings about the use of the Alleyway and whether the use was over the entire length of the Alleyway for the prescriptive period of twenty years. We will reverse the trial court's findings of fact as clearly erroneous only if the evidence presented at trial is legally insufficient to support those findings. *Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

¶26    First, Appellants claim that Robert Bate's testimony that the Alleyway was "still being used in the same exact way" from 1963 through 1977 was insufficient to establish continuous use of the Alleyway for that time period because Robert Bate moved "away from Utah and the [Alleyway]" and would only visit a few times a year. Appellants also state that Robert Bate did not make "any statements as to seeing any loading or unloading being done while visiting the property after he moved away."

¶27    However, "[a] use need not be 'regular' or 'constant' in order to be 'continuous.' All that is necessary is that the use be as often as required by the nature of the use and the needs of the claimant." *Crane v. Crane*, 683 P.2d 1062, 1064 (Utah 1984). Robert Bate testified that the Alleyway was "used a lot for loading and unloading" products for his parents' hardware store and was also used to perform maintenance on the apartment buildings "to get on the roof," to access the boiler room, or to access the doorway through the carport. He also testified that he observed deliveries of coal to the hardware store and the apartment buildings in the Alleyway when the buildings were heated by coal-fired furnaces. Even after he graduated from high school, Robert Bate observed that the Alleyway was used for unloading

and loading delivery trucks. Robert Bate testified that when he would visit the Bate Property after he moved to Colorado from 1967 through 1977, his parents were "[s]till doing the same thing they'd done for years."

¶28 Although Robert Bate's testimony about the use of the Alleyway was not as detailed as it might have been, the evidence is nevertheless sufficient to demonstrate that the owners of the Bate Property in 1948 through at least 1977 used the Alleyway continuously, acting under the assumption that they had a right-of-way over the Alleyway. The trial court relied on Robert Bate's testimony that the use of the Alleyway was "ongoing from at least 1948 where [Robert Bate] recall[ed] his parents' use of the alley from his personal experience working at Ron's Paint & Glass" until at least 1977 when Robert Bate's brother purchased the Jacob Property and assumed operation of his parents' hardware store on the Jacob Property. The court found that there was "no indication of use restriction against [Appellees'] use during a twenty year period from 1948 onward" and that the "[u]se appears to have been unmolested" for at least twenty years. Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the trial court's finding, we conclude that legally sufficient evidence supports the finding that the owners of the Bate Property used the Alleyway continuously for the requisite twenty years. *Crane*, 683 P.2d at 1064; *see also Jouflas*, 927 P.2d at 174.

¶29 Second, Appellants argue that there was insufficient evidence to support the trial court's finding that the owners of the Bate Property had used the entire length of the Alleyway for the prescriptive period of twenty years. Appellants claim that "[u]se of the entire length of the [Alleyway] was only established for eleven years," based on Robert Bate's testimony that "the Savage Brothers' coal truck would enter [the Alleyway] and deliver coal to the coal chute servicing the 'Bate Property' apartments [from 1948] until 1959 when the coal boiler was replaced."

¶30 But Robert Bate also testified that the Alleyway was used to perform regular maintenance on the apartment buildings, "to

get on the roof," access the boiler room, or access the doorway through the carport. The trial court found that "[t]he buildings located on the Bate Property that [Appellees] need[ed] to access for maintenance and repairs extend nearly the full 130 foot length of the claimed right-of-way." Robert Bate testified that between the years of 1947 and 1959, he observed his father accessing the Alleyway to perform maintenance, "[i]f there was any maintenance to be done." Robert Bate testified that even when he would visit the Bate Property after he had moved away in 1959, his parents were "[s]till doing the same thing they'd done for years" and that the Alleyway was "still being used the exact same way." Though Robert Bate did not testify to specific dates on which maintenance occurred, his testimony that his parents' use of the Alleyway was continuous from 1948 to 1977 along the entire length of the Alleyway is sufficient to support the trial court's findings. *Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

¶31   We conclude that Appellees adduced sufficient evidence at trial to support the trial court's determination that a prescriptive easement was established. Accordingly, the trial court did not clearly err in finding that Appellees presented clear and convincing evidence of the existence of a prescriptive easement.

## II. The Trial Court Did Not Clearly Err in Finding That the Prescriptive Easement Was Not Extinguished.

¶32   Appellants argue that the placement of a chain across the Alleyway from 1982 to 2007 extinguished any prescriptive easement that may have been established. An easement is extinguished "where use of [the] property violates a servitude burdening the property and the use is maintained adversely to a person entitled to enforce the servitude for the prescriptive period." *Lunt v. Lance*, 2008 UT App 192, ¶ 28, 186 P.3d 978 (alteration in original) (citation and internal quotation marks omitted). Thus, "adverse use by *the servient* estate holder . . . for more than twenty years, *without objection* by the dominant estate holder . . . , is sufficient to extinguish the easement." *Id.* (emphasis added). In other words, to show that Appellees' easement had

been extinguished, Appellants had to prove that they had interfered with Appellees' use of the easement for twenty years without objection. "A claimant's failure to establish *any one of the elements* [to extinguish an easement] will necessarily defeat the claim . . . ." *Creech v. Noyes*, 87 S.W.3d 880, 886 (Mo. Ct. App. 2002) (emphasis added).

¶33    The trial court found that "the evidence at trial indicate[d] that at the time of the purchase of the Jacob Property, the servient estate, by [Appellants] in 1987 there was an unlocked chain across the entrance to [the Alleyway]." The trial court further found that the purpose of the chain was "unknown, but the unlocked nature indicate[d] no intent to completely deprive the dominant estate of easement use." The court found that Appellants acted to prevent Appellees' use of the Alleyway beginning in 1987, when a lock was placed on the chain.

¶34    The evidence supports the trial court's finding that Appellants failed to prove the elements necessary to establish extinguishment of the easement. Appellants argue that a chain, whether locked or unlocked, is sufficient to show adverse use and that the evidence that there was a chain across the Alleyway from at least 1982 is therefore sufficient to establish interference with Appellees' use of the easement. Appellants contend that *Lance* establishes that a "locked" gate is not required to communicate a restriction and adverse use. 2008 UT App 192, ¶ 29. However, *Lance* analyzed only the abandonment of an easement—not the extinguishment of an easement by prescription. *See id.* In *Lance*, the plaintiff abandoned an easement through "nonuse" after a gate was built blocking a portion of the lane containing the easement. *Id.* This court stated that "the trial court interpreted the twenty-plus years of adverse use by the Lances, *without objection from* Lunt and coupled with non-use by Lunt, as evidence of Lunt's intent to *abandon* the easement west of the gate."[7] *Id.* (emphases added). *Lance* therefore did not

_____

7. On appeal, Appellants do not argue that Appellees abandoned the easement in the Alleyway.

address whether an unlocked gate is sufficient to demonstrate adverse use capable of extinguishing an easement, and it does not stand for the proposition advanced by Appellants—that an unlocked gate or chain is necessarily sufficient to show adverse use such that the trial court clearly erred in finding otherwise. *See id.*

¶35  Appellants also point to a lack of evidence showing that the gate was not locked from 1982 to 1987 and to a lack of "testimony about whether [the] previous property owner removed his lock upon selling the property to Jacob." Don Anderson, the only witness who testified about the chain's existence and use during this time period, testified that he did not know whether the chain was locked. And no evidence was presented to show who placed the chain across the Alleyway.

¶36  But Appellants cannot meet their burden by showing that there was *no* evidence that the gate was not locked. The party claiming that the easement was extinguished bears the burden of proof. *See, e.g.*, *Hamouda v. Harris*, 845 N.E.2d 374, 377 n.1 (Mass. App. Ct. 2006). The trial court relied on William Jacob's testimony that he placed a lock on the chain in 1987 when he purchased the Jacob Property. Contrary to Appellants' claim, the absence of any evidence establishing that there was a lock on the chain between 1982 and 1987 militates *against* a finding that the chain was locked during that period and supports the trial court's finding that the placement of a lock in 1987 began the prescriptive period for extinguishing the easement.

¶37  Appellants have failed to demonstrate that the trial court clearly erred by finding that the prescriptive period for Appellants' extinguishment claim began to run only in July 1987, when William Jacob locked the chain across the Alleyway, and ended in November 2006 when Appellees' counsel objected to the locked chain. As the trial court stated, even in this "best-case scenario" for Appellants, the adverse use occurred for only nineteen years and the prescriptive period was not met. Because Appellants failed to establish that the prescriptive period was met, their claim for extinguishment of Appellees' easement fails. *See Creech v. Noyes*, 87 S.W.3d 880, 886 (Mo. Ct. App. 2002).

Accordingly, the trial court did not clearly err in finding that the prescriptive easement was not extinguished.

### III. Appellants Are Not Entitled to Damages for Appellees' Removal of the Obstructions.

¶38　Appellants also challenge the trial court's decision not to award them damages for trespass by Appellees. The trial court ruled against Appellants on their trespass claim, finding that Taysom's severance of the chain to access the Alleyway was reasonable. Appellants contend that even if Taysom had a right to access the Alleyway, the trial court should still have awarded damages because "Taysom [did not] present evidence that vandalizing [Appellants'] property was necessary for any lawful use." But Appellants fail to cite any case to support the proposition that a defendant to a trespass action must prove that his damage to property was necessary to rightfully access the easement, rather than only reasonable.

¶39　As stated by the trial court, Utah law provides that the rights of the dominant owner of an easement are impliedly limited by the rights of the servient owner. *See Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 158 (Utah 1946). "[T]he use of an easement must be as reasonable and as little burdensome to the servient estate as the nature of the easement and its purpose will permit." *Id.* (emphasis omitted) (citation and internal quotation marks omitted). To recover damages, "the record must show that the dominant owner's exercise of theeasement is 'unreasonable in that it will unnecessarily damage the servient estate.'" *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1249 (Utah 1990) (quoting *Big Cottonwood Tanner Ditch*, 174 P.2d at 160).

¶40　Here, Appellees could exercise their right to use the prescriptive easement in the Alleyway so long as the exercise of their right was not "so unusual and so obviously unreasonable that it would be clearly apparent to the court merely from learning what the proposed method was that other methods must be practicably available." *Big Cottonwood Tanner Ditch*, 174 P.2d at 160. The trial court expressly concluded that breaking the

chain and removing the concrete barricade was, under the circumstances, Taysom's only reasonable method to gain access to the easement he had a right to use. Appellants have failed to show that this finding was not supported by legally sufficient evidence. Accordingly, the trial court's finding that Taysom's actions were reasonable is not clearly erroneous.

## CONCLUSION

¶41 We conclude that Appellants have failed to demonstrate any error in the trial court's determination that Appellees have a prescriptive easement over the Alleyway and that this easement has not been extinguished. We also conclude that the trial court did not clearly err in finding that Taysom's actions to access the Alleyway were reasonable under the circumstances, and consequently Appellants were not entitled to trespass damages. We therefore affirm the trial court's ruling in all respects.

---